Mrs. Brenda Alice Bosley

ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG DIVISION

BRENDA A. BOSLEY, et al.,

    Plaintiffs,

v.              Civil Action No. 3:07-CV-142

COLONEL D.L. LEMMON, SUPERINTENDENT
OF THE WEST VIRGINIA STATE POLICE, et al.,

    Defendants.

The deposition of BRENDA ALICE BOSLEY, taken in the above-styled matter at the Candlewyck Inn, 65 South Mineral Street, Keyser, West Virginia, on Thursday, the 12th day of February, 2009, beginning at 1:15 p.m.

A P P E A R A N C E S
On Behalf of the Plaintiffs:
    Harry P. Waddell, Esquire
    THE LAW OFFICES OF HARRY P. WADDELL
    300 West Martin Street
    Martinsburg, West Virginia  25401

Verbatim Valley Transcripts
vvt@cebridge.net                (800) 843-2414



EXHIBIT 1

1
2  administration of the claim, not facts in the
3  underlying suit, so I don't know that they're
4  proper.
5      MR. FOSTER: Well --
6      MR. WADDELL: I mean, obviously, if
7  you're going to ask her what facts does she
8  have to support punitive damages, she doesn't
9  even know what the standard is.
10     MR. FOSTER: Okay.
11     MR. WADDELL: She can't answer legal
12 questions.
13     MR. FOSTER: Well, that's what I was
14 driving at, so I'll --
15     MR. WADDELL: She can answer facts.
16     MR. FOSTER: I'll ask her then what acts
17 of the defendants do you believe should be
18 punished?
19     MR. WADDELL: You can ask her that, I
20 suppose, if you want.
21     THE DEPONENT: I don't believe they did
22 their job.

Mrs. Brenda Alice Bosley

108

BY MR. FOSTER:

Q. You can be negligent and not do your job.

MR. WADDELL: Again, we're getting into legal standards, which she doesn't know anything about.

MR. FOSTER: Well, it is her Complaint and she is alleging punitive damages, so I would like to know what she thinks deserves to be punished.

MR. WADDELL: She answered your question. I mean, if you want to elaborate -- want her to elaborate -- I guess you said they didn't do their job.

BY MR. FOSTER:

Q. Do you think they intentionally didn't do their job?

A. That's all I can say is they didn't do their job.

Q. Do you think that they intentionally didn't do their job?

A. They didn't do their job.

Mrs. Brenda Alice Bosley

109

1  Q. Do you think that was based out of
2  neglect or intent?
3  A. They didn't do their job. I don't
4  know how else to answer it.
5  MR. WADDELL: I think that's a jury
6  issue.
7  MR. FOSTER: It's her claim. I think she
8  would know.
9  MR. WADDELL: It's a jury question
10 whether they were negligent or if there was
11 some higher standard that they didn't meet.
12 MR. FOSTER: If she didn't believe they
13 did something worthy of being punished, then
14 it has no business being in her Complaint.
15 MR. WADDELL: She already said she
16 believes they're worthy of being punished.
17 They didn't do their job. Now, I don't know
18 what else you want from her.
19 BY MR. FOSTER:
20 Q. Do you have any reason to believe
21 that these defendants intentionally caused
22 harm, or prevented, or allowed harm to befall

1  Dr. Bosley?
2      A.   I'm just saying they didn't do their
3  job.
4      Q.   That's not really responsive to the
5  question.  I mean I guess we can sit here and
6  go back and forth all night like this.  Have
7  you ever had any personal involvement with
8  law enforcement in the past?
9      A.   No.
10     Q.   Has anyone in your family ever had
11 any personal involvement?
12     A.   No.
13     Q.   No one in your family has ever been
14 arrested or pulled over by the police?
15     MR. WADDELL:  Objection to relevancy.
16 You can respond.
17     THE DEPONENT:  No one has ever been
18 arrested, unless they got tickets that I'm
19 not aware of.  I don't know.
20 BY MR. FOSTER:
21     Q.   So no one in your family holds a
22 grudge towards the police?

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG DIVISION

BRENDA A. BOSLEY, Administratrix of
The Estate of JAMES C. BOSLEY, Deceased,
And BRENDA BOSLEY,

    Plaintiff,

Vs.

    Civil Action No.: 3:07-CV-142
    Honorable John Preston Bailey

COLONEL D.L. LEMMON, Superintendent of the
West Virginia State Police, in his Official Capacity,
West Virginia State Trooper JAMES M. MILLS,
In both his Official and Personal Capacity,
THE MINERAL COUNTY SHERIFF'S OFFICE,
CHIEF DEPUTY PAUL SABIN of the Mineral County
Sheriff's Office, in both his Official and Personal
Capacity, and JOHN DOES I-V, in both their Official
Capacities and Personal Capacities,

    Defendants.

## PLAINTIFF, BRENDA A. BOSLEY'S, ANSWERS TO DEFENDANTS COLONEL D.L. LEMMON AND JAMES M. MILLS' FIRST SET OF INTERROGATORIES

    Plaintiff, Brenda A. Bosley, by and through her counsel, responds to the Defendants, Colonel D.L. Lemmon and James M. Mills' First Set of Interrogatories as follows:

    1.    State your full name, social security number, date of birth and place of birth, as well as other names by which you have been known during your adult life.

    ANSWER:    Brenda Alice Bosley; SSN: 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; DOB: September 10, 1956; Place of birth: Orange County, Fullerton, California.

    2.    State Dr. Bosley's full name, social security number, date of birth and place of birth, as well as other names by which he has been known during his adult life.

    ANSWER:    James Courrier Bosley; SSN: 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; DOB: April 6, 1941; Place of birth: Claysville, West Virginia



EXHIBIT 2

10. Identify each physician and other health care provider, including psychologists and mental health counselors, who have treated or examined you as a result of the occurrence described in your Complaint, and for each such person, state the nature of such treatment or examination and the dates each treatment or examination occurred. If there is ongoing treatment for these illnesses or injuries, provide the name and address of each physician and other health care provider, and the nature of the treatment, where each treatment is received and how often the treatment is received.

**ANSWER:** The Plaintiff has not sought any medical treatment, physical or mental, as a result of the occurrence.

11. Without referring to your Complaint or documents attached hereto or otherwise, itemize in detail each and every expense you incurred as a result of the occurrence described in your Complaint, including the amount of each expense and the payee.

**ANSWER:**

| | |
|---|---:|
| Dr. Bosley's Funeral: | $ 7,178.96 |
| Space in Crypt at Cemetery: | $ 100.00 |
| Crypt Engraving: | $ 150.00 |
| Filing of Dr. Bosley's Will: | $ 38.00 |
| Consultation of Estate Distribution: | $ 525.00 |
| Estate Settlement: | $ 850.00 |
| Newspaper ads concerning pick-up of patient medical records: | $ 73.62 |
| Bathroom removal and kitchen paneled (where incident occurred): | $ 2,580.00 |
| Paneling and Plumbing of bathroom that was torn out: | $ 1,480.00 |
| Brenda Bosley's health insurance premium (every 3 months) (Plaintiff lost group plan upon Dr. Bosley's death) | $ 1,239.33 |
| Lost pension payments of deceased | $ 220,000.00 |
| TOTAL: | $ 234,214.91 |

General compensatory and punitive damages are unquantifiable.

12. Identify each physician and other health care provider, including psychologists and mental health counselors, who have treated or examined you <u>during the ten (10) year period prior to</u> the incident described in your complaint, and for each such person, state the nature of such treatment or examination and the dates each treatment or examination occurred.

**ANSWER:** In 1995, Dr. Bosley was the Plaintiff's family physician and she saw him for regular check-ups from 1995 until he retired. She also was treated by the following physicians:

6.  Please produce each bill, invoice, explanation of benefits, and all other documents in substantiation of your itemization of expenses for each and every expense you incurred as a result of the occurrence described in your Complaint, including, but not limited to the amount of each expense and the payee set forth in your answers to the Defendants' interrogatories.

**RESPONSE:** Documents in the possession of Plaintiff that are responsive to this request are attached.

7.  Please produce all records, including W-2 forms, tax returns, wage statements, and all other documents in substantiation of your claim for Dr. James Bosley's past or future lost income, profits, or earnings or diminution of earning capacity as a result of the incident described in your Complaint.

**RESPONSE:** Pension documentation will be produced.

8.  Please produce all records and other documents which in any way document a claim or demand of any insurance company or other person, firm or corporation which may have claimed or noticed you of any interest in this litigation or the funds you may recover herein, either by way of subrogation or otherwise, and as may have been reported in your answer to the Defendants' interrogatories.

**RESPONSE:** Not applicable.

9.  In substantiation of the allegations in you Complaint, please produce a copy of Plaintiff Brenda Bosley and Dr. James Bosley's marriage certificate and any other documents relating to Plaintiff Brenda Bosley's legal relationship to Dr. James Bosley.

**RESPONSE:** Will be produced.

                                                           BRENDA A. BOSLEY,
                                                          By Counsel

_/s/ Harry P. Waddell_
HARRY P. WADDELL
300 West Martin Street
Martinsburg, West Virginia
(304) 263-4988
WV State Bar No. 3883

## Michael D. Lyman, Ph.D.
4613 Villa Wood Ct. • Columbia, MO . 65216 • (573) 875-7472 • FAX: (573) 256.5067

# EXPERT REPORT OF MICHAEL D. LYMAN, PH.D.

Re: Brenda A. Bosley, Administratrix of the Estate of James C. Bosley Deceased and Brenda Bosley v. Colonel D.L. Lemmon, Superintendent of the West Virginia State Police Et. Al.; CASE NUMBER 3:07-cv 142 In the United States District Court Northern Division of West Virginia, Martinsburg Division

February 24, 2009



EXHIBIT 3

policereview@gmail.com

Case 3:07-cv-00142-JPB  Document 137  Filed 08/11/09  Page 10 of 17  PageID #: 1053
06-30-'09 07:44 FROM-                                                    T-219 P009/035 F-184

8

probably had guns in the house."[26] Mills stated, I know she (Brenda) told me there were guns in the house,"[27] and that he knew Bosley had weapons in the house – "Several."

There is also evidence that Mills had independent knowledge of Dr. Bosley's violent tendencies and his alcohol abuse. For example, the record shows that Mills was aware of a previous situation (occurring on July 20, 2005)[28] where he was called to the Bosley residence and Brenda told Mills that Dr. Bosley was drunk or had been drinking and was attempting to get items from his residence. Dr. Bosley had pulled the phones from the wall and had raised a hammer up [in a threatening fashion]. According to Mills, Dr. Bosley was intoxicated at the time of this incident.[29] On another occasion, Mills responded to the Bosley residence and saw Dr. Bosley passed out in the front yard. Mills would smell alcohol on him.[30] Mills stated, "I knew that he drank."[31]

Corporal Mills' clearly possessed important information about Dr. Bosley's suicide threats, his drinking problem and firearms located in his residence. Not only is this information important to have when serving a mental hygiene order but it is also important information to share with Deputy Sabin. There is disturbing evidence in the record that Mills failed to do so.

<u>Deputy Sabin</u>: The record shows, for example, that Sabin stated, that he understood that the order was for when a family member was "having some kind of mental difficulty with alcohol or drugs of some type." While Sabin agreed that it was possible that the subject of a mental hygiene order was a potential threat to himself or herself he also stated that he did not think that a family member thought the Bosley to be a threat to himself or others.[32] Sabin stated that he was unaware that Bosley had threatened to commit suicide.[33] Sabin further stated that Corporal Mills had not shared that information with him. For example, when asked if Trooper Mills indicated anything to him about Dr. Bosley making suicide threats, Sabin replied, "...I do not recall any of that."[34] In fact, there is evidence that Mills failed to inform Sabin about firearms in Dr. Bosley's residence as well. For example, Sabin stated that he did not recall discussing with Mills the circumstances leading to the issuance of the order.[35]

It is clear that Mills was in close communication with Mineral County Medical Examiner Chris Guynn, Brenda Bosley and Prosecutor Lynn Nelson about Dr. Bosley. It also appears that Deputy Sabin's involvement occurred after the mental hygiene order was obtained. It is a concern, however, that not only was Sabin unaware of Dr. Bosley's suicide threats but Mills, who accompanied him to the Bosley residence, never informed Sabin of the suicide threats or the likelihood that firearms would be present. If this is to be believed, then Mills' failure to impart this critical information to Sabin is an egregious breakdown of communication. Such information was critical in the serving of the mental hygiene order to properly protect Dr. Bosley.

➢ *It is my opinion, stated within a reasonable degree of professional certainty, that the failure of Corporal Mills to properly inform Deputy Sabin of Dr. Bosley's suicide threats and the presence of numerous firearms in the residence was an egregious operational error that contributed to the ability of Bosley to take his own life. Had such information been properly communicated between Mills and Sabin, it is likely that proper safeguards could have been taken to control Dr. Bosley and protect him from harm.*

## II. Defendant Officers Sabin and Mills ignored their duties and responsibilities to protect Dr. Bosley from danger while serving the mental hygiene warrant.

---

[26] Statement by Mills given at Keyser Detachment (no date)
[27] Mills deposition, p. 49
[28] Civil Case Information Statement; Domestic Violence Cases dated 7-21-05
[29] Mills deposition, p. 41-42; 44
[30] Mills deposition, p. 46-47
[31] Mills deposition, p. 48
[32] Sabin deposition, p. 35; 37; 39-41
[33] Sabin deposition, p. 53-54
[34] Sabin deposition, p. 35
[35] Sabin deposition, p. 55

Case 3:07-cv-00142-JPB   Document 137   Filed 08/11/09   Page 11 of 17 PageID #: 1054
06-30-'09 07:55 FROM-                                                T-220 P012/035 F-184

11

Mills stated that he believed it was his duty to protect Dr. Bosley from injury to himself on August 19, 2005.[51]

In summary, it is clear that at no time did Defendant Officers Sabin or Mills have control over Dr. Bosley. It is my opinion that from the moment the officers first made contact with Dr. Bosley at his door, they had a responsibility to protect him. Instead of properly patting him down, placing him in restraints and controlling his every move, Sabin and Mills permitted Dr. Bosley to lead them to various areas of the residence, while unrestrained, to the location where he ultimately shot himself. Sabin and Mills' failure to properly control Dr. Bosley, under circumstances known in this case, represents a clear breach of duty and conduct that is inconsistent with nationally recognized standards of care.

> *It is my opinion, stated within a reasonable degree of professional certainty, that Defendant Officers Sabin and Mills ignored their duty to properly control and safeguard Dr. Bosley while serving the mental hygiene order at his residence. Failure on the part of Sabin and Mills to do so is contrary to requirements under West Virginia State law as well as nationally recognized standards of care in professional policing.*

### III. Administrators within the Mineral County Sheriff's Office failed to properly train defendant Sabin in the proper handling of suicidal persons while serving a mental hygiene warrant.

There is evidence in this case that Deputy Sabin was not properly trained in the serving of a mental hygiene order. Nowhere in the record does it show that Sabin inquired about the nature of the order or the circumstances leading to the issuance of the order. If for no other reason than officers' safety, Sabin should have known to inquire about potential dangers that might pose a threat to officers while serving the order. Furthermore, as previously stated in this report, West Virginia State law clearly identifies the county sheriff as the law enforcement entity responsible for service of mental hygiene orders.

Given this legal duty, Mineral County Sheriff Craig Fraley and the Mineral County Commission had a responsibility to properly train sheriff's deputies. Sabin's failure to inquire about and take reasonable precautions to safeguard against possible threats to him, Mills or Dr. Bosley, in addition to statements made by him that he had no training in serving mental hygiene orders is evidence that no such training was provided to him.

For example the record shows that Sabin stated that even though he has served an estimated 15-20 such orders, he does not recall any training he has received from any source. He stated, "...I've never seen any training on that."[52] This includes, training on the "criteria for serving a mental hygiene order."[53] He also stated that he was given no instructions when leaving the detention center for serving the order.[54] Sabin stated that he had possession of the order.

Based on Sabin's statements, the fact that he has served 15-20 mental hygiene orders, and inferring that other deputies have also served such orders, it is reasonable that Sheriff Craig Fraley and the Mineral County Commission would recognize the need for training in this area. This is exacerbated by the fact that West Virginia State law clearly identifies the county sheriff as the designated law enforcement entity to serve such warrants, and as such this responsibility can not be expected of a different law enforcement agency in the state.

In summary, state law requires the county sheriff to serve mental hygiene orders and Mineral County Sheriff's deputies are actively serving them. However, based on Sabin's statements, no

---

[51] Mills deposition, p. 116
[52] Sabin deposition, p. 26
[53] Sabin deposition, p. 41
[54] Sabin deposition, p. 55

Case 3:07-cv-00142-JPB Document 137 Filed 08/11/09 Page 12 of 17 PageID #: 1055
06-30-'09 07:56 FROM- T-220 P013/035 F-184

12

training has been provided for this responsibility. Sheriff Fraley and the Mineral County Commission clearly ignored their responsibility to properly train deputies in this regard and their failure to do so represents gross indifference toward the safety of the very citizens they are sworn to protect.

> It is my opinion, stated within a reasonable degree of professional certainty, that based on evidence in this case, Sheriff Craig Fraley and the Mineral County Commission failed to properly train Deputy Sabin in serving mental hygiene orders. Sabin's lack of training resulted in Dr. Bosley not being properly restrained and his ability to locate a firearm and take his own life. It is likely that if Deputy were properly trained, Dr. Bosley would be alive today.

## IV. Administrators within the West Virginia State Police failed to properly train Corporal Mills in the proper handling of suicidal persons while serving a mental hygiene warrant.

The record is clear in this case that Mills, who had spoken with Prosecutor Nelson, Medical Examiner Guynn and Brenda Bosley and understood that Dr. Bosley had a drinking problem, was suicidal and possessed a number of firearms in his residence. However, this information was not communicated with Deputy Sabin at any time prior to or during the execution of the mental hygiene order. Had Mills properly communicated this information to Sabin, it is likely that precautions would have been taken to properly control and protect him.

Disturbingly, there is evidence in this case is that Trooper Mills had received no training for the proper service of such orders. For example, when asked if he ever received any training or any document covering the procedures on how to serve a mental hygiene order Mills stated, "No, not that I recall."[55] Mills further stated that it is "fairly infrequent" that the state police are involved with the service of Mental Hygiene Orders[56] and that he previously assisted in executing a mental hygiene order one time.[57]

While Mills stated that he had served mental hygiene warrants on only one previous occasion, it is unclear as to the number of times other troopers within the West Virginia State Police have done so. If it is to be known that state troopers throughout the West Virginia State Police, assist in the service of such orders, as Mills did in this case, then training on how to properly handle such duties must be provided. Mills' statement that he cannot recall receiving any training on service of the orders is evidence that Colonel D. L. Lemmon and other commanders and policy makers within the West Virginia State Police failed to provide such training.

Mills knew or should have known that officers serving a mental hygiene order must take steps to prevent a person in their custody from committing suicide and that they have a responsibility to communicate important information that might affect the safety or officers or others to all officers involved. A reasonably trained officer would do so.

> It is my opinion, stated within a reasonable degree of professional certainty that Colonel D. L. Lemmon as the chief executive of the West Virginia State Police, failed to provide proper training to Trooper Mills in the service of mental hygiene orders and in communicating important information affecting the safety of any party involved. Mill's lack of training resulted in important information about dangers to Dr. Bosley and the officers themselves not being properly communicated to Deputy Sabin. If Trooper Mills had properly informed Deputy Sabin about potential dangers at Dr. Bosley's residence, it is likely that safeguards would have been taken that would have reduced if not eliminated opportunities for Dr. Bosley to take his own life.

---

[55] Mills deposition, p. 110
[56] Sabin deposition, p. 28
[57] Mills deposition, p. 10

Case 3:07-cv-00142-JPB   Document 137   Filed 08/11/09   Page 13 of 17   PageID #: 1056
06-30-'09 07:57 FROM- T-220 P014/035 F-184

13

### V. Administrators within the Mineral County Sheriff's Office and the West Virginia State Police Ratified the conduct of Deputy Sabin and Trooper Mills bay failing to hold them accountable for their actions.

It is a concern that nowhere in the case file does is there evidence that either Deputy Sabin or Trooper Mills were ever held accountable for their failure to properly control and protect Dr. Bosley. Failure on the part of each organization to do so has the practical effect of ratifying the conduct of these officers.

Ratification of misconduct, whether the misconduct as a violation of policy, procedure, training curriculum, directives, Law, or the United States Constitution, is a strong indicator of the orientation, customs, and practices of a department. Police administrators throughout our nation acknowledge that a law enforcement agency is controlled not only by the law, written and verbal directives, and training curriculum, but also by the customs of the department.

The failure on the part of Trooper Mills (West Virginia State Police) to properly communicate known dangers at Dr. Bosley's residence and the failure on the part of both Mills and Deputy Sabin (Mineral County Sheriff) to properly control Dr. Bosley, should have been addressed internally though disciplinary review and action. The internal response of both agencies could include demotion in rank, suspension, retraining, verbal or written reprimands or termination. According to the record, none of these accountability measures took place.

The failure on the part of administrators within the Mineral County Sheriff's Office and the West Virginia State Police to address indiscretions that were clearly made by Mills and Sabin a venue for continued misconduct by other officers in their respective agencies. This, in turn, sends a clear message to rank and file officers that such behavior is acceptable and that punishments for such conduct is minimal of not entirely absent.

➢ *It is my opinion, stated within a reasonable degree of professional certainty, that based on evidence in this case, administrators of the Mineral County Sheriff's Office and the West Virginia State Police failed to properly hold defendant officers in this case accountable for their actions. Failure to do so ratifies unprofessional and dangerous conduct and creates a custom whereby similar conduct in the future is acceptable and will go unpunished.*

This concludes my report at this time.

Case 3:07-cv-00142-JPB   Document 137   Filed 08/11/09   Page 14 of 17 PageID #: 1057
06-30-'09 07:58 FROM-                                            T-220  P015/035 F-184

14

## Fees and Previous Experience

This report contains the opinions I am prepared to express at trial in this matter. My fees in this case are at the rate of $200 per hour and an initial retainer of $3000. I charge $2300 per day plus expenses for depositions and any work conducted out of town.

I have testified as an expert witness on eighty-seven occasions including hearings, depositions and trials. These are listed in Appendix #2.

Respectfully submitted,


Michael D. Lyman, Ph.D.
February 24, 2009




COURT REPORTING
& VIDEO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# MARTINSBURG DIVISION

BRENDA A. BOSLEY, ADMINISTRATRIX OF THE ESTATE OF
JAMES C. BOSLEY, DECEASED, AND BRENDA BOSLEY

VS.

COLONEL D.L. LEMMON, SUPERINTENDENT OF THE WEST
VIRGINIA STATE POLICE, et al.

Civil Action No. 3:07-CV-142

DEPOSITION OF MICHAEL D. LYMAN, PH.D

JUNE 30, 2009



NATIONWIDE SCHEDULING

OFFICES  MISSOURI  •  ILLINOIS  •  KANSAS

HEADQUARTERS: 711 NORTH ELEVENTH STREET, ST. LOUIS, MISSOURI 63101
800.280.3376
www.midwestlitigation.com

1 deescalate and control through deescalation in
2 part. Deescalation is one of the control
3 mechanisms, you know, that can contribute to an
4 individual's willingness to comply.
5     Q. Okay. So as I understand your
6 testimony -- and again, I'm not trying to be
7 repetitive here, but if you had -- even if you
8 had training on dealing with persons in crisis
9 and dealing with suicidal persons and dealing
10 with taking people into custody and control,
11 that would not be sufficient unless you actually
12 had someone who linked that to the obligation
13 for serving mental hygiene orders?
14     A. That's right. There has to be a focus
15 to the training.
16     Q. Okay. Do you know how many states
17 require the service of mental hygiene orders?
18     A. I believe all states have one form or
19 another of mental hygiene-type orders in their
20 statutes.
21     Q. Okay. And I think you testified
22 earlier that you did not know the training
23 obligations of any particular state as it
24 pertains to mental hygiene orders; is that
25 accurate?

1  International Association of Chief of Police
2  protocols, to your knowledge, have not been
3  adopted as a standard in West Virginia?
4      A.  That's right.  They're recognized as
5  recommended police procedure by the nations
6  largest professional policing organization.
7      Q.  But they've not been formally adopted
8  by the West Virginia state police, have they?
9      A.  Not word for word to my knowledge.
10     Q.  Or by the West Virginia Legislature?
11     A.  I don't believe so.
12     Q.  And you have no knowledge, do you, that
13 the recommendations or the training key of the
14 IACP is taught in West Virginia to West Virginia
15 state troopers or to sheriff's departments?
16     A.  Would you repeat that?  I'm sorry.
17     Q.  You have no foundation of knowledge
18 that the training of the IACP protocol or their
19 training key is taught in West Virginia to West
20 Virginia state troopers or sheriff's
21 departments?
22     A.  No specific knowledge, no.
23     Q.  Now, as to weapons, in terms of the
24 knowledge that Corporal Mills had, you agree, do
25 you not, that he knew only that Dr. Bosley was a