**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**BRENDA A. BOSLEY, et al.,**

      Plaintiffs,

**v.**                                  **Civil Action No. 3:07-CV-142
(Judge Bailey)**

**COLONEL D. L. LEMMON,
SUPERINTENDENT OF THE WEST
VIRGINIA STATE POLICE, IN HIS
OFFICIAL CAPACITY, et al.,**

      Defendants.

## ORDER GRANTING DEFENDANTS LEMMON AND MILLS' MOTION FOR SUMMARY JUDGMENT

This case is presently before the Court on defendants Colonel D.L. Lemmon and Corporal James M. Mills' Motion for Summary Judgment [Doc. 115], plaintiffs' Response [Doc. 119] , and defendants Colonel D.L. Lemmon and Corporal James M. Mills' Reply [Doc. 121]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants Colonel D.L. Lemmon and Corporal James M. Mills' Motion for Summary Judgment [Doc. 115] should be **GRANTED.**

## BACKGROUND

This case arises out of events which took place on August 19, 2005. On that date the of the Mineral County Prosecuting Attorney requested that Deputy Paul Sabin go to Dr. James C. Bosley's residence to serve a mental hygiene order on Dr. Bosley. Defendant Mills voluntarily accompanied Deputy Paul Sabin. After their arrival at Dr. Bosley's

residence, Dr. Bosley shot himself. Plaintiffs claim both officers were deliberately indifferent to Dr. Bosley's constitutional rights. Plaintiffs further allege that both officers are personally liable for damages related to Dr. Bosley's suicide.

On October 15, 2007, plaintiffs brought suit in the Circuit Court of Mineral County, pursuant to 42 U.S.C. § 1983 and the West Virginia Constitution, alleging violations of his Fifth and Fourteenth Amendment right to Due Process; his Fourth Amendment right to be free from unreasonable searches and seizures; and state claims for negligence and wrongful death. [Doc. 1-1]. Plaintiffs brought suit against: Colonel D.L. Lemmon, Superintendent of the West Virginia State Police, in his official capacity; West Virginia State Trooper James M. Mills, in his personal and official capacities; the Mineral County Sheriff's Office; and Chief Deputy Paul Sabin of the Mineral County Sheriff's Office, in his personal and official capacities. [Doc. 1-1]. On October 31, 2007, defendants Colonel D.L. Lemmon, Corporal James Mills, and the Mineral County Sheriff's Department removed this action to the United States District Court for the Northern District of West Virginia. [Doc. 1]. On August 31, 2008, plaintiffs voluntarily dismissed the 42 U.S.C. § 1983 claims against Colonel D.L. Lemmon and James M. Mills in their official capacities. [Doc. 50]. On February 25, 2009, plaintiffs filed an Amended Complaint. [Doc. 85].

In the Amended Complaint, plaintiffs dropped their Fourth Amendment claim, added the Mineral County Commission, and the Sheriff of Mineral County in his official capacity as defendants, and added a "failure to train" claim against the Mineral County Commission and the Sheriff of Mineral County. [Doc. 85]. The Amended Complaint states claims for: deprivation of life without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, and Article 3, Section 10 of the West Virginia Constitution;

failure to train and implement training policies for service of mental hygiene orders against the Mineral County Commission and Sheriff in his official capacity; common law claims against all defendants for recklessness and/or negligence in failing to prevent Dr. Bosley from harming himself; and wrongful death. [Doc. 85].

On July 1, 2009, defendants Colonel D.L. Lemmon and Corporal James Mills moved to dismiss plaintiffs' official capacity claims on the basis of qualified immunity. [Docs. 115, 116]. In their motion, defendants argue that as a matter of law plaintiffs cannot sustain a claim for violation of any statutory or constitutional right of Dr. Bosley as defendants acted reasonably in light of the circumstances. ([Doc. 116] at 1-2). Further, defendants argue that they are shielded by qualified immunity as plaintiffs cannot show that defendants acted with deliberate indifference to Dr. Bosley's well being, and that defendant Mills' qualified immunity extends to shields Colonel Lemmon, as superintendent of the West Virginia State Police, from plaintiffs' claims of vicarious liability.

On July 28, 2009, plaintiffs filed an Offer of Judgment and Acceptance of Offer of Judgment [Doc. 126]. The Acceptance of Offer of Judgment settled all plaintiffs claims against defendants Mineral County Commission, Sheriff Craig Farley, and Deputy Paul Sabin, leaving as defendants only Colonel Lemmon and Corporal Mills. (Id.)

## FACTS

The Undisputed Material Facts ("UMF"), taken in the light most favorable to plaintiffs, are as follows:

1.  On August 24, 2002, Dr. Bosley was married to Ms. Bosley (see Marriage Certificate, [Doc. 116-2]).

2.  Ms. Bosley noticed that Dr. Bosley was exhibiting signs of substance abuse in April,

3

2004.  (Brenda Bosley Depo. [Doc. 116-1] at 51).

3.    Ms. Bosley states Dr. Bosley was not acting right; he was talking to animals and people that weren't there, he was delusional, and most of the time was uncommunicative (Brenda Bosley Depo. [Doc. 116-1] at 52).

4.    Ms. Bosley attributed Dr. Bosley's substance abuse to the fact that Dr. Bosley had recently retired (in 2002) from his twenty-six year private medical practice in Keyser, West Virginia.  (Brenda Bosley Depo. [Doc. 116-1] at 48, 52).

5.    In early July of 2005, Dr. Bosley's behavior began to deteriorate to the point that Ms. Bosley began to fear for her safety (Brenda Bosley Depo. [Doc. 116-1] at 16).

6.    In early July of 2005, Dr. Bosley began locking himself into the upstairs portion of his home and he carried a gun with him while he was in the house.  (Brenda Bosley Depo. [Doc. 116-1] at 16).

7.    In early July of 2005, Ms. Bosley would find Dr. Bosley staring out of the window in the middle of the night and on several occasions he stood over Ms. Bosley and watched her as she slept.  (Brenda Bosley Depo. [Doc. 116-1] at 16).

8.    As a result of Dr. Bosley's strange behavior, Ms. Bosley moved out of the marital residence and returned to her pre-marriage residence in Antioch, West Virginia (Brenda Bosley Depo. [Doc. 116-1] at 14).

9.    On the night of July 21, 2005, Dr. Bosley came to Ms. Bosley's residence and demanded entry.  (Brenda Bosley Depo. [Doc. 116-1] at 21).

10.   Dr. Bosley went to a nearby storage shed, retrieved a claw hammer, and proceeded to beat the handle off the front door to Ms. Bosley's residence.  (Brenda Bosley Depo. [Doc. 116-1] at 21).

11. Ms. Bosley attempted to call the police, however, she reports that Dr. Bosley came after her with the hammer. (Brenda Bosley Depo. [Doc. 116-1] at 21).

12. Ms. Bosley then ran to another telephone located in the bedroom. (Brenda Bosley Depo. [Doc. 116-1] at 21).

13. Dr. Bosley again came after her with the hammer but placed the hammer on the bed once he realized that Ms. Bosley's call had gone through to the authorities (West Virginia State Police Complaint Report for Domestic Assault, dated July 21, 2005 [Doc. 116-4]).

14. As a result of the July 21, 2005, incident, Ms. Bosley obtained a domestic violence petition ("DVP") against Dr. Bosley. (Brenda Bosley Depo. [Doc. 116-1] at 23).

15. On July 22, 2005, Dr. Bosley telephoned Ms. Bosley approximately fifty times. (Brenda Bosley Depo. [Doc. 116-1] at 20).

16. The numerous phone calls prompted Ms. Bosley to file a criminal complaint against Dr. Bosley for telephone harassment. (West Virginia State Police Complaint Report for Telephone Harassment, dated July 22, 2005, [Doc. 116-5]).

17. Dr. Bosley's repeated telephone calls to Ms. Bosley violated the terms of the DVP and as a result of this violation, Dr. Bosley was arrested (Mineral County Magistrate Court Criminal Complaint dated July 22, 2005, [Doc. 116-6]).

18. On August 5, 2005, Ms. Bosley filed for divorce alleging that Dr. Bosley was guilty of cruel and inhuman treatment toward Ms. Bosley (Petition for Divorce, [Doc. 116-7]).

19. On August 17, 2005, Dr. Bosley called Ms. Bosley and, due to the nature of their conversation, Ms. Bosley believed that Dr. Bosley was contemplating "something."

(Brenda Bosley Depo. [Doc. 116-1] at 58).

20.     Ms. Bosley then called Chris Guynn, the Mineral County Medical Examiner and long time acquaintance and medical examiner understudy to Dr. Bosley (Brenda Bosley Depo. [Doc. 116-1] at 59); (Deposition of Chris Guynn, [Doc. 116-8] at 7, 12).

21.     Ms. Bosley asked Mr. Guynn to check on Dr. Bosley and Mr. Guynn said that he would.  (Brenda Bosley Depo. [Doc. 116-1] at 59).

22.     After meeting with Dr. Bosley on August 18, 2005, Mr. Guynn called Ms. Bosley and told her that Dr. Bosley was not acting right and that something needed to be done soon because Dr. Bosley might try to kill himself (Deposition of Chris Guynn, [Doc. 116-8] at 24).

23.     Mr. Guynn stated that Dr. Bosley appeared "very sweaty, very anxious, [and] pretty reclused [sic] to me." (Deposition of Chris Guynn, [Doc. 119-1] at 18).

24.     Mr. Guynn suggested that they contact defendant Corporal James Mills to see if he could help, and Ms. Bosley agreed (Deposition of Chris Guynn, [Doc. 116-8] at 27).

25.     Mr. Guynn called defendant Mills and told him the circumstances, including the fact that he believed it might be too late to serve the mental hygiene order the next day. (Deposition of Chris Guynn, [Docs. 116-8, 119-1] at 27-28).

26.     Defendant Mills then contacted Ms. Bosley and suggested that she come to the prosecutor's office at 9:00 a.m. the next morning to file a mental hygiene complaint (Brenda Bosley Depo. [Doc. 116-1] at 60).

27.     On the morning of August 19, 2005, Ms. Bosley showed up at the prosecutor's office to file a mental hygiene complaint against Dr. Bosley.  (Brenda Bosley Depo. [Doc. 116-1] at 60).

6

28.	The Honorable Lynn Nelson, then the Prosecuting Attorney for Mineral County, drafted the mental hygiene complaint (Deposition of the Honorable Lynn Nelson, [Doc. 116-9] at 13).

29.	Shortly thereafter, Circuit Judge Phillip Jordan Jr., issued a mental hygiene order for Dr. Bosley (Mental Hygiene Order dated August 19, 2005, [Doc. 116-10]).

30.	Mr. Nelson delivered the mental hygiene order to Deputy Sabin. (Deposition of the Honorable Lynn Nelson, [Doc. 116-9] at 17).

31.	Mr. Nelson requested that defendant Mills accompany Deputy Sabin due to defendant Mills' relationship with Dr. Bosley. (Deposition of the Honorable Lynn Nelson, [Doc. 116-9] at 18, 67).

32.	Deputy Sabin and defendant Mills departed the police station at approximately 10:00 a.m. on August 19, 2005. (Deposition of the Honorable Lynn Nelson, [Doc. 116-9] at 20).

33.	Deputy Sabin and defendant Mills arrived at Dr. Bosley's residence approximately five minutes later (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 55).

34.	Defendant Mills had knowledge that Dr. Bosley was a hunter and probably had guns in his house. (Def. Lemmon and Mills' Answer [Doc. 86] ¶ 21).

35.	Defendant Mills had knowledge that Dr. Bosley was potentially suicidal. (Def. Lemmon and Mills' Answer [Doc. 86] ¶ 21).

36.	Dr. Bosley had a long time problem with alcohol which was common knowledge. (Deposition of Chris Guynn, [Doc. 119-1] at 14).

37.	Defendant Mills had knowledge, at the time the mental hygiene order was served, that in the month before August 19, 2005, Dr. Bosley had broken into the residence

where Mrs. Bosley was staying, jerked the telephone from the wall, and threatened her with a hammer.  (Deposition of Corporal James Mills, [Doc. 119-2] at 42-43).

38. Defendant Mills had knowledge that Dr. Bosley was potentially a threat to himself or others.  (Deposition of Corporal James Mills, [Doc. 119-2] at 106).

39. Deputy Sabin and defendant Mills knocked on the door but received no response. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 64).

40. Deputy Sabin then knocked on a bay window near the foyer and awakened Dr. Bosley, who had been asleep on the couch.  (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 64-65).

41. Dr. Bosley came to the door and let Deputy Sabin and defendant Mills into his residence.   (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 68).

42. Dr. Bosley was wearing only an unbuttoned button down shirt and shorts. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 70).

43. After the officers entered Dr. Bosley's residence, Deputy Sabin handed Dr. Bosley the mental hygiene order.  (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 68).

44. Dr. Bosley then began to read over the mental hygiene order.  (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 68).

45. Defendant Mills noted that Dr. Bosley was not acting himself as he did not greet defendant Mills in usual manner.  (Deposition of Corporal James Mills, [Doc. 116-12] at 63).

46. Defendant Mills also noted that Dr. Bosley looked anxious, jittery, and sweaty. (Deposition of Chris Guynn, [Doc. 119-1] at 103).

47. After reading over the mental hygiene order, Dr. Bosley wanted to take a shower

before leaving, but Deputy Sabin informed him that they did not have time. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 77-78).

48. Dr. Bosley then started walking back through the residence and stated he needed to use the bathroom. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 82).

49. Defendant Mills remained in the living room, den, and dining area throughout the incident. (Deposition of Chris Guynn, [Doc. 119-1] at 82).

50. Deputy Sabin followed Dr. Bosley to bathroom in the back corner of his residence. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 82).

51. Deputy Sabin remained with Dr. Bosley and also scanned the bathroom for weapons. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 88, 140).

52. Meanwhile, Dr. Bosley attempted to urinate but could not. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 88).

53. Dr. Bosley then exited the bathroom and walked back the way they had come and Deputy Sabin followed behind him. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 89).

54. Defendant Mills noticed the two men exit the bathroom and followed behind them (Deposition of Corporal James Mills, [Doc. 116-12] at 64-66).

55. As Dr. Bosley rounded a corner into the living room, he increased his pace. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 90).

56. Deputy Sabin then increased his pace to keep up. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 92).

57. Dr. Bosley then went into a second bathroom off the living room and slammed the door. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 96).

58. Defendant Mills entered the living room just in time to hear the door slam which caused him to look up. (Deposition of Corporal James Mills, [Doc. 116-12] at 67).

59. After the door slammed, Deputy Sabin immediately reached for the knob but before he could grasp it, he heard a gunshot. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 97-98).

60. Both officers took cover. (Deposition of Corporal James Mills, [Doc. 116-12] at 71; Deposition of Deputy Paul Sabin, [Doc. 116-11] at 98).

61. Deputy Sabin got up, opened the door the door to the bathroom, and found Dr. Bosley lying on the floor, next to the commode, with a single gunshot wound to his head. (Deposition of Deputy Paul Sabin, [Doc. 116-11] at 99-101).

62. As Deputy Sabin examined Dr. Bosley for vital signs, defendant Mills telephoned EMS for assistance. (Deposition of Corporal James Mills, [Doc. 116-12] at 73).

63. Defendant Mills also notified Sgt. Droppleman, West Virginia State Police, Keyser Detachment Commander, of Dr. Bosley's suicide. (Deposition of Corporal James Mills, [Doc. 116-12] at 75).

64. Defendant Mills could not say, based on personal knowledge, where the weapon that killed Dr. Bosley had come from. (Deposition of Corporal James Mills, [Doc. 119-2] at 120).

65. Shortly thereafter, Sgt. Droppleman arrived at the scene began his investigation of the incident. (Deposition of Sergeant John Droppleman, [Doc. 116-14] at 22).

66. EMS personnel arrived on the scene shortly thereafter and began treating Dr. Bosley. (Deposition of Sergeant John Droppleman, [Doc. 116-14] at 24).

67. Mr. Guynn also arrived at the scene but recused himself from the investigation due

to his relationship with Dr. Bosley; Jeffrey Fraley, Medical Examiner for several of the adjacent counties, was assigned to do the death investigation. (Deposition of Chris Guynn, [Doc. 116-8] at 41-43).

68. Sgt. Droppleman concluded, after investigating the incident, that Dr. Bosley died from a single self-inflicted gunshot wound to the head and that the fatal shot was fired from a 9MM Luger owned by Dr. Bosley. (Deposition of Sergeant John Droppleman, [Doc. 116-14] at 37-39).

69. Mr. Fraley also concluded that Dr. Bosley died as a result of a single gunshot wound to the head (Deposition of Mr. Jeffrey Fraley, [Doc. 116-15] at 35-37).

70. Based on the information contained in Mr. Fraley's report, the cause of death on Dr. Bosley's Death Certificate is listed as self inflicted gunshot wound. (Death Certificate of James C. Bosley, [Doc. 116-16]).

71. Stephen Cogar is an expert in police methods and procedures retained to testify on behalf of the State Police and defendant Mills. (Deposition of Stephen Cogar, [Doc. 119-3] at 3, 35).

72. The police must take steps to prevent a person in their custody from committing suicide when they have intervened at the request of a family member to protect the person from causing harm to himself. (Deposition of Stephen Cogar, [Doc. 119-3] at 122-123, 52-53).

73. If two police officers are serving a mental hygiene order on a person at his residence, the fact that the person has recently threatened suicide is an important piece of information that should be shared between the officers. (Deposition of Stephen Cogar, [Doc. 119-3] at 53; Deposition of Sergeant John Droppleman, [Doc.

119-4] at 123).

74. If two police officers are serving a mental hygiene order on a person at his residence, the fact that the person has firearms in the house is an important piece of information that should be shared between the officers. (Deposition of Stephen Cogar, [Doc. 119-3] at 53-54; Deposition of Sergeant John Droppleman, [Doc. 119-4] at 123).

75. A police officer serving a mental hygiene order should be aware that the person being served may present a threat of harm to himself or others. (Deposition of Stephen Cogar, [Doc. 119-3] at 54-55; Deposition of Sergeant John Droppleman, [Doc. 119-4] at 124).

76. The only information defendant Mills provided to Deputy Sabin about Dr. Bosley was how to find the Bosley residence. (Deposition of Deputy Paul Sabin, [Doc. 119-4] at 34).

77. Defendant Mills did not tell Deputy Sabin that Dr. Bosley had threatened suicide. (Deposition of Deputy Paul Sabin, [Doc. 119-4] at 34-35).

## DISCUSSION

### I.     Standard

The moving party is entitled to summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). *See **Charbonnages de France v. Smith***, 597 F.2d 406, 414 (4th Cir. 1979). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the nonmoving party and to view the facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. The moving party has the burden to show an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The party opposing summary judgment must then demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson*, 477 U.S. at 248. A mere scintilla of evidence supporting the case is insufficient. *Id.* at 252.

## II.    Qualified Immunity Standards

Plaintiffs claim violations of Dr. Bosley's federal and state constitutional rights. Therefore, the federal qualified immunity standard applies to Plaintiffs' federal constitutional claim and the West Virginia qualified immunity standard applies to Plaintiffs' state constitutional claim.

A.    <u>Federal Qualified Immunity Standard</u>

Qualified immunity shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001), *overruled on other grounds* by *Pearson v. Callahan*, 129 S.Ct. 808, — U.S.— (Jan. 21, 2009); *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992). The Supreme Court has noted the need to determine the

question of immunity before trial, emphasizing that "immunity is an entitlement not to stand trial" rather than a defense from liability. *Katz*, 533 U.S. at 200-201 (2001).

When a plaintiff sues a state police officer in the officer's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from the individual officer. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). If sued "individually," a state police officer may raise an affirmative defense of qualified immunity. *Id.* The test for qualified immunity was announced by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982):

> Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

The qualified immunity test is one of objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith. *Harlow*, 457 U.S. at 818-19. Courts look to whether a reasonable official could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred. *Id. See also*, *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 995 (11th Cir. 1995). "Thus, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* Furthermore, the contours of a right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.*

B. State Qualified Immunity

State qualified immunity is likewise properly determined pretrial. *See Hutchison v. City of Huntington*, 198 W.Va. 139, 479 S.E.2d 649 (1996). In *Hutchison*, Justice

14

Cleckley wrote:

> Immunities under West Virginia law are more than a defense to a suit in that they grant governmental bodies and public officials the right not to be subject to the burden of trial at all. The very heart of the immunity defense is that it spares the defendant from having to go forward with an inquiry into the merits of the case....

*Id.* 479 S.E.2d at 658 (citing ***Swint v. Chambers County Commission***, 514 U.S. 35 (1995)). West Virginia's qualified immunity standard is modeled after its federal counterpart. In Syllabus Point 3 of ***Robinson v. Pack***, 679 S.E.2d 660 (June 18, 2009), the West Virginia Supreme Court stated, "Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

An individual officer's entitlement to qualified immunity generally extends to the agency that employs that officer:

> In cases arising under W.Va. Code § 29-12-5, and in the absence of express provisions of the insurance contract to the contrary, the immunity of the State is coterminous with the qualified immunity of a public executive official whose acts or omissions give rise to the case. However, on occasion, the State will be entitled to immunity when the official is not entitled to the same immunity; in others, the official will be entitled to immunity when the State is not. The existence of the State's immunity of the State [sic] must be determined on a case-by-case basis.

Syllabus Point 6 of ***Pruitt v. West Virginia Dept. of Public Safety***, 222 W.Va. 290, 664 S.E.2d 175 (2008). In the case at bar, plaintiffs' allegations against defendant Lemmon in

his official capacity are derived entirely from the allegations against defendant Mills. The West Virginia Supreme Court has described vicarious liability as follows:

> An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employee relationship. Of course, if he is acting within the scope of his employment, then his principal or employer may also be held liable.

*Id.* at 138. Thus, as plaintiffs have merely alleged vicarious liability for the state claims against defendant Lemmon in his official capacity, if defendant Mills is found to be protected by qualified immunity, then plaintiffs' claims against defendant Lemmon fail as a matter of law.

## III.    Citation to Authority

Colonel D.L. Lemmon, and Corporal James Mills ("State Police Defendants") argue they are entitled to summary judgment for two reasons: (1) plaintiffs failed to produce any subjective state of mind evidence to show that defendants were deliberately indifferent to the safety and well-being of Dr. Bosley; (2) defendant Mills acted reasonably and appropriately throughout the entire incident giving rise to plaintiffs' Complaint. ([Doc. 116] at 12). As such, defendants argue defendant Mills is entitled to qualified immunity from both the federal and state claims asserted by the plaintiffs, and because plaintiffs claims against defendant Mills fail, their claims against Colonel Lemmon must also fail. (Id.) In response plaintiffs argue a material issue of fact exists as to defendant Mills' state of mind, and whether he was deliberately indifferent to the safety and well being of Dr. Bosley. [Doc. 119].

In order to determine if defendant Mills (and by extension Colonel Lemmon) are

16

entitled to qualified immunity the Court must determine whether the facts plaintiffs have alleged make out a constitutional violation, and if so, whether that constitutional right is clearly established. **Pearson v. Callahan**, 129 S.Ct. 808, — U.S.— (Jan. 21, 2009) (citing and limiting **Saucier**, 533 U.S. 194, noting that the inquiry is flexible and need not be taken up in any particular order). After review of the arguments of the parties, and the applicable law, the Court finds that plaintiff has failed to present a material issue of fact as to violation of Dr. Bosley's rights under the Constitution of the United States and the Constitution of West Virginia.

A.     Plaintiffs Have Failed to Show A Federal Constitutional Violation

To withstand a motion for summary judgment, plaintiffs must show that defendant Mills violated a clearly established right of which a reasonable person would have known. **Harlow v. Fitzgerald**, 457 U.S. 800, 818 (1982). It is also important to note that a police officer may meet his constitutional obligations to an individual and yet fail to prevent the ultimate harm. "Significantly, an official 'who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm was not ultimately averted.' **Farmer**, 511 U.S. at 844." **Brown v. Harris**, 240 F.3d 383, 389 (4th Cir. 2001). This maxim applies with equal force to claims of deliberate indifference to detainees.

Plaintiffs have alleged that defendant Mills violated Dr. Bosley's right to due process by acting with deliberate indifference in failing to take any steps to prevent Dr. Bosley's suicide. ([Doc. 119] at 10) (citing **Buffington v. Baltimore County, Md.**, 913 F.2d 113 (4th Cir. 1990). As such, to sustain their claim against defendant Mills, plaintiffs must establish that defendant Mills was deliberately indifferent to Dr. Bosley's health and safety in violation

of Dr. Bosley's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. In the State Police Defendants' Summary Judgment Motion [Doc. 116], they argue plaintiffs have failed to present a genuine issue of material fact with regard to whether defendant Mills was deliberately indifferent to the health and safety of Dr. Bosley when assisting Deputy Sabin in serving the mental hygiene order on August 19,. 2005. ([Doc. 116] at 15). Specifically, defendants argue plaintiffs have failed to show that defendant Mills subjectively knew that his actions were inappropriate in light of the risks known to him at the time of Dr. Bosley's suicide. (Id.) This Court agrees.

In **Buffington**, the Fourth Circuit held that officers violated a detainee's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution when a suicidal detainee hanged himself in an isolation cell after being left there unsupervised and with no other suicide prevention measures. 913 F.2d at 117-118. The Court affirmed the jury verdict noting the nature of the duty owed a detainee when officers know the detainee is a danger to himself:

> That leads to the question of the nature of the duty owed. The district court instructed the jury that it could find the individual officers liable under 42 U.S.C. § 1983 for their deprivation of a constitutionally protected liberty interest if it found that they knew that Buffington was suicidal and in need of emergency intervention, but nonetheless acted with deliberate indifference in failing to take any steps to prevent the suicide. The court noted, however, that liability could not be premised on a finding that these officers failed to act on a speculative suicide risk-by not screening for suicidal tendencies or taking other preventive measures-if they had no knowledge that Buffington was

suicidal. This instruction defined the duty in terms of the
recognized duty of care owed to pretrial detainees, and we
think this was proper.

*Id.* at 119.  Thus, when officers take someone into custody and have knowledge that the

person is suicidal, such as here when they served the mental hygiene order on Dr. Bosley,

they owe that detainee a duty of care which includes not acting with indifference to the

detainee's suicidal tendencies.  *Id.*  The United States Supreme Court set out the elements

required to demonstrate deliberate indifference on the part of officers in ***Farmer v.***

***Brennan***, 511 U.S. 825, 837(1994) [1]:

We hold . . . . that a prison official cannot be found liable under the Eighth
Amendment for denying an inmate humane conditions of confinement unless
the official knows of and disregards an excessive risk to inmate health or
safety; the official must both be aware of facts from which the inference could
be drawn that a substantial risk of serious harm exists, and he must also
draw the inference.

The Fourth Circuit of Appeals applied the ***Farmer*** deliberate indifference standard

in ***Parrish ex rel. Lee v. Cleveland***, 372 F.3d 294 (4th Cir. 2004) noting:

"Deliberate indifference is a very high standard-a showing of mere negligence
will not meet it." ***Grayson v. Peed***, 195 F.3d 692, 695 (4th Cir. 1999).  An
officer is deliberately indifferent to a substantial risk of harm to a detainee
when that officer "knows of and disregards" the risk. ***Farmer v. Brennan***, 511
U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In order to be liable
under this standard, "the official must both be aware of facts from which the
inference could be drawn that a substantial risk of serious harm exists, and

---

[1]  Although ***Farmer*** deals with deliberate indifference in an Eighth Amendment context
as Mr. Farmer was a prisoner, the same deliberate indifference standard applies to pre-
trial detainees under the Fourteenth Amendment.  *See **Brown***, 240 F.3d at 388.

he must also draw the inference." *Id.* Stated somewhat differently, "[d]eliberate indifference requires a showing that the defendants *actually knew of* and *disregarded* a substantial risk of serious injury to the detainee or that they *actually knew of* and *ignored* a detainee's serious need for medical care." *Young*, 238 F.3d at 575-76 (emphases added).

Liability under this standard thus requires two showings. First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers should have recognized it; they actually must have perceived the risk. *Rich v. Bruce*, 129 F.3d 336, 340 n. 2 (4th Cir.1997). Second, the evidence must show that the official in question subjectively recognized that his actions were "inappropriate in light of that risk." *Id.* As with the subjective awareness element, it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

*Parrish,* 372 F.3d at 302 (emphasis in original). The Court in *Parish* found the officers had not acted with deliberate indifference when placing a "spit guard" over the head of a detainee, picked up for public intoxication, who subsequently aspirated on his own vomit and died while being transported to a detoxification facility several miles away. *Id.* at 296-97. The Court found that despite the officer's knowledge that the decedent was drunk, and that he had vomited several times in his brief period in custody, their decision to put the "spit guard" over his head, put him in the back of a truck, and transport him to a detoxification facility did not amount to "deliberate indifference" to the detainee's health and safety. The Court reasoned: "[n]o direct evidence in the record indicates that the officers were aware of the distinct risk created by leaving the spit mask on [the detainee]. None of

the officers have stated that they viewed the mask as increasing the risk to [the detainee], and there is no evidence that EMT Earl (or anyone else who may have been present from the time the spit mask was placed over [the detainee's] head until the time [the detainee] left the station) warned the officers of any such risk." *Id.* at 305.

Thus, in order to make out a deliberate indifference claim, a plaintiff must demonstrate that a police officer "actually must have recognized that his actions were insufficient," in light of the known danger. *Parish*, 372 F.3d at 302. The "actual knowledge" requirement of the deliberate indifference test is "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.*

As an example of what would satisfy the "actual knowledge" requirement, the Court in *Parrish* cited to *Odom v. South Carolina Dept. of Corrections*, 349 F.3d 765 (4th Cir. 2003), where an inmate was attacked after being placed in a temporary holding compartment next to inmates he had warned the officers would try to kill him. *Id.* at 303. Specifically, the Court noted:

> In response to this developing situation, . . . .the defendants openly mocked Odom and, through their alleged contemporaneous statements, indicated both that they recognized the risk to Odom and that they believed that he somehow deserved to be beaten. One of the officers flippantly observed that the assailants "got th[ei]r snitch;" another scolded Odom, stating, "you should not have snitched on them guys[,] you stupid [expletive]." *Id.* at 771 (alterations in original). In light of this direct evidence that the officers actually welcomed the harm that befell Odom and *subjectively realized* that the precautions they had taken were inadequate, the panel majority concluded that the evidence. . . . sufficiently supported a claim of deliberate indifference. . . .

*Parrish,* 349 F.3d at 308 (emphasis added).

Here, plaintiffs have failed to present the Court with any evidence that defendant Mills has actual knowledge that his actions were insufficient to protect Dr. Bosley. Mrs. Bosley admits that she was not inside Dr. Bosley's residence on the morning of August 19, 2005. (Benda Bosley Depo. [Doc. 116-1] at 69-70). As such, she has no direct evidence regarding defendant Mills' subjective state of mind. Additionally, in her deposition, Mrs. Bosley admitted she has no evidence that defendant Mills subjectively knew his actions were insufficient in light of the risk that Dr. Bosley would harm himself or someone else. (Id. at 90-95). Even taking the facts in the light most favorable to plaintiffs, that defendant Mills stayed in the living room while Dr. Bosley was escorted to the bathroom, and then subsequently went unexpectedly into the second bathroom and slammed the door, plaintiffs cannot show defendant Mills' subjectively knew his actions were insufficient to protect Dr. Bosley from himself.

Further, the case at bar is easily distinguishable from **Buffington** and **Odom**. In fact, the only similarity between the cases is that the officers were aware of some risk of harm to the detainees. In **Buffington**, the officers left the detainee in the cell–without supervision–and without removing items which the detainee could use to harm himself (his clothing). In Odom, the officers put the inmate into a situation where those the officers knew wanted to harm the inmate could attack him, and then when the inmate was attacked the officers "openly mocked Odom and, through their alleged contemporaneous statements, indicated both that they recognized the risk to Odom and that they believed that he somehow deserved to be beaten." **Parish**, 349 F.3d. at 308. Here, at least one

officer followed Dr. Bosley into the restroom and was following him out of the house when Dr. Bosley suddenly ran into a second bathroom and shot himself.

It is undisputed that Dr. Bosley unexpectedly turned into a second bathroom, slammed the door, and shot himself with a gun hidden from the officers' view before either officer could open the door. Again, even assuming that Dr. Bosley was suicidal; that defendant Mills knew he was suicidal; that defendant Mills knew Dr. Bosley likely had guns in his house; and that defendant Mills noticed Dr. Bosley was anxious and sweating; plaintiffs have presented no evidence from which a jury could infer that defendant Mills *subjectively knew* allowing Deputy Sapen to escort Dr. Bosley to the bathroom before leaving the house was insufficient to protect the health and safety of Dr. Bosley. The officers did not leave him alone as the officers in **Buffington** did, nor did they make statements from which a jury could infer that they subjectively knew the risk to Dr. Bosley and disregarded it, as the officers did in **Odom**.

The above styled case is most similar to that of **Parish**, where the officers–aware of the risks to the detainee's safety–considered possible risks and settled on a course of action which would best protect the detainee's health and safety (laying him on his side with his head at an angle to prevent injury or aspiration). Similarly here, defendant Mills and Deputy Sabin attempted to prevent Dr. Bosley from harming himself or others:

- the officers followed Dr. Bosley while in the house;

- the officers scanned the rooms Dr. Bosley entered for weapons;

- Dr. Bosley was asked to leave the residence at quickly (they allowed him to use the bathroom, but told him he did not have time to shower);

- it was defendant Mills who suggested to Mrs. Bosley that Dr. Bosley could be evaluated for his mental health issues;

- it was defendant Mills who knew Dr. Bosley and who agreed to accompany Deputy Sabin so he could talk to Dr. Bosley and make him more comfortable;

- both officers noted Dr. Bosley's appearance–his shorts and open button down shirt–upon entering the residence and, thus, thought it unlikely Dr. Bosley had a concealed weapon;

- defendant Mills testified that on the morning of August 19, 2005, his attention was always on the safety of Dr. Bosley, Deputy Sabin, and himself;

Thus, just as in **Parish**, where the officers only appreciated the risk of the "spit guard" too late, so also here, the officers appreciated too late the risk of defendant running into a room, slamming the door, obtaining a gun, and shooting himself before the officers had time to stop him. *See **Brown v. Harris***, 240 F.3d 383, 389 (4th Cir. 2001) (stating "to the extent that the 'reasonable response' prong is part of the state of mind requirement, an official who responds reasonably to a known risk has not 'disregard[ed] an excessive risk to inmate health or safety,' **Farmer**, 511 U.S. at 837, 114 S.Ct. 1970, and has therefore not acted with deliberate indifference. *See, e.g., **Hamilton v. Leavy***, 117 F.3d 742, 748 (3d Cir.1997) ('If a prison official responds reasonably to a risk to an inmate's safety, he or she cannot be found to have acted with a sufficiently culpable state of mind.'); **Doe v. Welborn**, 110 F.3d 520, 524 (7th Cir.1997) (stating that the 'reasonable response' prong of **Farmer** is simply 'another way of saying that a plaintiff has the burden of proving the subjective (knowing disregard) component of the test elaborated in **Farmer**.'))

Plaintiffs also argue in their Response [Doc. 119] that upon arriving at the residence, the officers should have patted Dr. Bosley down, placed restraints on him, and controlled his every move. (Id. at 12) (citing Affidavit of Michael D. Lyman, Ph.D. [Doc. 119-6]). In evaluating the officer's conduct the Court should not, however, look to what precautionary measures the officers *might* have taken, but those that the officers actually took. ***Brown***, 240 F.3d at 389. The old adage is true: hindsight is 20/20. The officers took reasonable action calculated to protect the health and safety of Dr. Bosley. Their actions were ultimately unsuccessful, but plaintiffs have presented no evidence that the failure was a result of deliberate indifference on the part of the officers. Accordingly, defendants' Motion for Summary Judgment should be granted with regard to plaintiffs' federal claims.

B.    Plaintiffs Have Failed to Show A State Constitutional Violation

In addition to claims arising under the Fifth and Fourteenth Amendments to the United States Constitution, plaintiffs allege that defendant Mills violated Dr. Bosley's corresponding rights under the West Virginia Constitution, as well as assert common law causes of action for negligence and wrongful death. As plaintiffs have failed to present a genuine issue of material fact that could strip defendant Mills of his qualified immunity, plaintiffs' state constitutional and common law claims must dismissed as a matter of law.

Although West Virginia's jurisprudence with regard to the deliberate indifference standard is not as well developed at its federal counterpart, existing West Virginia case law demonstrates that the state standard is entirely consistent with the federal. In Syllabus Points 4 and 5 of ***Nobles v. Duncil***, 202 W.Va. 523, 505 S.E.2d 442 (1998), the West Virginia Supreme Court of Appeals stated:

4.      Deliberate indifference to the serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain which is proscribed by the prohibition on cruel and unusual punishment in the Federal and State Constitutions.

5.      To establish that a health care provider's actions constitute deliberate indifference to a prison inmate's serious medical need, the treatment, or lack thereof, must be so grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness.

In fact, the West Virginia's Supreme Court founded its adoption of these Syllabus Points entirely upon federal law. *See Nobles*, 202 W.Va. 523, 533.  Based on West Virginia's wholesale adoption of the federal deliberate indifference standard with regard to prisoners' medical needs, the analysis of plaintiffs' federal constitutional claims contained in § III(A), *supra*, apply equally to plaintiffs' deliberate indifference claims under the West Virginia Constitution.  Consequently, defendant Mills is entitled to qualified immunity from plaintiffs' state constitutional law claims.

In addition to being qualifiedly immune from plaintiffs' common law claims of negligence and wrongful death, said claims also fail because West Virginia case law forbids negligence suits against public officials performing discretionary acts within the scope of their duty. In *Clark v. Dunn*, 195 W.Va. 272, 465 S.E.2d 374 (1995), a hunter brought a negligence action against a West Virginia Department of Natural Resources officer for injuries the hunter received while the officer was attempting to disarm another hunter. In Syllabus Point 4 of the opinion, the West Virginia Supreme Court of Appeals stated:

If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his

26

duty, authority, and jurisdiction, he is not liable for negligence or other error
in the making of that decision, at the suit of a private individual claiming to
have been damaged thereby.

*Clark*, 465 S.E.2d 374, Syl. Pt. 5. In the case at bar, defendant Mills was acting in a

discretionary capacity within the scope of his duty at all times relevant to plaintiffs'

Complaint. Thus, plaintiffs' common law claims against defendant Mills fail as a matter of

law.

      C.      <u>Plaintiffs Have Failed to State a Claim Against Defendant Lemmon in his</u>
                  <u>Official Capacity</u>

As noted above, plaintiffs' claims against the Defendant Lemmon in his official

capacity are derived entirely from their claims against defendant Mills for state law claims

under a theory of vicarious liability. [Doc. 85]. The West Virginia Supreme Court has

described vicarious liability as follows:

An agent or employee can be held personally liable for his own
torts against third parties and this personal liability is
independent of his agency or employee relationship. Of course,
if he is acting within the scope of his employment, then his
principal or employer may also be held liable.

*Pruitt*, 664 S.E.2d at 185. Here, plaintiffs have not disputed that defendant Mills was

acting in the scope of his employment when he went to Dr. Bosley's house to serve the

mental hygiene order. As such, defendant Lemmon might be liable in his official capacity,

*if defendant Mills was liable* for his actions on that date. ***Id.***

As discussed above, however, defendant Mills is not liable as "Government officials

performing discretionary functions are shielded from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ***Robinson v. Pack***, 679 S.E.2d 660, Syl. Pt. 3 (June 18, 2009).  Defendant Mills did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known" when executing the mental hygiene order.  *See* III(B), *supra*.  Further, suits in negligence against officers acting in a discretionary capacity within the scope of their duty, are prohibited under state law. ***Clark***, 465 S.E.2d 374, Syl. Pt. 5.  As defendant Mills cannot be found liable on plaintiffs' negligence and wrongful death claims, defendant Lemmon is likewise excused.  ***Pruitt***, 664 S.E.2d at 185.  As such, plaintiff's claims against defendant Lemmon also fail as a matter of law.

## IV.     CONCLUSION

Based on the foregoing reasoning, the Court finds that defendants' Motion for Summary Judgment should be, and hereby is, **GRANTED.**  As such, it is **ORDERED** that plaintiffs' remaining claims be **DISMISSED with prejudice**, and the above-styled case be **STRICKEN** from the active docket of this Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:**  August 31, 2009

JOHN PRESTON BAILEY
CHIEF UNITED STATES DISTRICT JUDGE